FILED'07 FEB 12 09:23USDC-ORP

1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                        FOR THE DISTRICT OF OREGON

10   JOHN WIDMAN,                        )
                                         )
11              Plaintiff,               )
                                         )      CV 05-1908 HU
12        v.                             )
                                         )      FINDINGS AND
13   JOANNE B. BARNHART,                 )      RECOMMENDATION
     Commissioner of Social Security,    )
14                                       )
                Defendant.               )
15   _____ )

16   David B. Lowry
     9900 S.W. Greenburg Road
17   Columbia Business Center, Suite 235
     Portland, Oregon 97223
18
                    Attorney for Plaintiff
19
     Karin Immergut
20   United States Attorney
     District of Oregon
21   Neil J. Evans
     Assistant United States Attorney
22   1000 S.W. Third Avenue, Suite 600
     Portland, Oregon 97204-2902
23
     / / /
24
     / / /
25
     / / /
26

PAGE 1 - KEYBOARD()

Franco L. Becia
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900 MS/901
Seattle, Washington 98104

     Attorneys for Defendant

HUBEL, Magistrate Judge:

     Plaintiff John Widman brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his claim for Disability Insurance Benefits. For the reasons set forth below, the decision of the Commissioner should be affirmed.

PROCEDURAL BACKGROUND

     Widman filed for disability insurance benefits and was found disabled on the basis of rectal carcinoma, with an onset date of July 10, 1990. His benefits were terminated effective October 31, 1996, after a finding of medical improvement. Widman failed to appeal the termination decision in a timely fashion, and he filed a second application. The second application was denied, and Widman filed this application on November 21, 1997. His application was denied initially and upon reconsideration. On September 30, 1999, a hearing was held before an Administrative Law Judge (ALJ). In a decision dated June 29, 2000, the ALJ found Widman was not entitled to benefits. The Appeals Council denied Widman's request for review, and Widman sought judicial review of the Commissioner's decision.

     On June 8, 2003, this court issued an Order pursuant to stipulation of the parties, reversing the ALJ's decision and remanding the case for supplemental proceedings. A second hearing occurred on November 1, 2004. On January 6, 2005, the ALJ issued a decision in which he found Widman not disabled. The Appeals Council declined review,

1    and Widman again appeals for judicial review.

2    ## DISABILITY ANALYSIS

3    The ALJ engages in a five-step sequential inquiry to determine whether a claimant

4    is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a

5    summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094,

6    1098-99 (9th Cir. 1999):

7    Step One. The Commissioner determines whether claimant is engaged in

8    substantial gainful activity. If so, claimant is not disabled. If claimant is not engaged in

9    substantial gainful activity, the Commissioner proceeds to evaluate claimant's case under

10   step two. 20 C.F.R. §§ 404.1520(b), 416.920(b).

11   Step Two. The Commissioner determines whether claimant has one or more severe

12   impairments. If not, claimant is not disabled. If claimant has a severe impairment, the

13   Commissioner proceeds to evaluate claimant's case under step three. 20 C.F.R.

14   §§ 404.1520(c), 416.920(c).

15   Step Three. Disability cannot be based solely on a severe impairment; therefore,

16   the Commissioner next determines whether claimant's impairment "meets or equals" one

17   of the impairments listed in the Social Security Administration (SSA) regulations, 20

18   C.F.R. Part 404, Subpart P, Appendix 1. If so, claimant is disabled. If claimant's

19   impairment does not meet or equal one listed in the regulations, the Commissioner's

20   evaluation of claimant's case proceeds under step four. 20 C.F.R. §§ 404.1520(d),

21   416.920(d).

22   Step Four. The Commissioner determines whether claimant is able to perform

23   work he or she has done in the past. If so, claimant is not disabled. If claimant

24   demonstrates he or she cannot do work performed in the past, the Commissioner's

25   evaluation of claimant's case proceeds under step five. 20 C.F.R. §§ 404.1520(e),

26   416.920(e).

3 - FINDINGS AND RECOMMENDATION

Step Five. The Commissioner determines whether claimant is able to do any other work. If not, claimant is disabled. If the Commissioner finds claimant is able to do other work, the Commissioner must show a significant number of jobs exist in the national economy that claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled. If the Commissioner does not meet this burden, claimant is disabled. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id

## THE ALJ's FINDINGS

The ALJ found that Widman's ability to work is limited by degenerative arthritis of the lumbosacral spine, causing mechanical low back pain, and colorectal cancer. Tr. 366. He determined that Widman retained the residual functional capacity to perform a modified range of light work. He was able to lift twenty pounds frequently and ten pounds occasionally. He could only stand or walk for two hours in an eight-hour day. Tr. 372, 373. The ALJ found that Widman was not able to perform his past relevant work, but that he could perform other work existing in the economy, and was not disabled within the meaning of the Social Security Act.

## FACTUAL BACKGROUND

Born in 1955,Widman was 49 years old at the time of the most recent hearing. He has a high school education and has worked as a cattle rancher. Widman alleges disability since November 1, 1996, the date that his first disability payments ended, on the basis of chronic pain in his spine and hips and numbness in his hands.

4 - FINDINGS AND RECOMMENDATION

## MEDICAL EVIDENCE

In September 1990 Widman was diagnosed with rectal adenocarcinoma and received a colostomy. Tr. 191-92. [1] George M. Burns, M.D., was his primary care physician. Widman was treated with chemotherapy and radiation therapy. Between October 23, 1990, and December 12, 1990, Widman received 5940 cGy[2] in 33 fractions. Tr. 214. In February 1991, Widman received additional radiation therapy, for a total of about 8000 cGy. Tr. 211, 205. However, the tumor remained unresectable. By July 1, 1991, more than thirty biopsies were negative, and Widman was advised to return for follow up at three month intervals and to have CT scans of the abdomen and pelvis every six months. Tr. 205.

In April 1992 Widman was advised to reduce his weight from 246 pounds to 200 pounds, and to begin decreasing his use of Loricet Plus, a hydrocodone and acetaminophen pain reliever. Dr. Burns advised him to use Tylenol for pain. Tr. 227. In June 1993 Widman reported feeling well with no new complaints. Tr. 226. In July 1995 Widman told Dr. Burns that he was "getting along very well." Tr. 225. He was advised to return in six months.

In January 1996 Widman completed an Activities of Daily Living and Socialization form in which he asserted that he required help with his personal needs and grooming, and that he did very little housework due to pain in his hips and lower back. Tr. 121-26. Widman asserted that his hips and legs "are always hurting" and that he could sit only a short time "because of pain." Tr. 124. Examination of the abdomen and pelvis by CT scan in April 1996 were within normal limits, with "no evidence of metastatic disease,

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed with the Commissioner's Answer.

[2] Centi-Gray units ("cGy") quantify energy per gram of tissue delivered by an x-ray to the irradiated section of the body.

lymphadenopathy or other features of note." Tr. 248.  In May 1996 the Social Security
Administration reviewed the medical file and concluded that Widman no longer met the
requirement for impairment under the listings.  Tr. 93.

On May 31, 1996, Widman was examined by Patrick Barfield, F.N.P.  Tr. 231-33.
Mr. Barfield noted that Widman was not taking any medication and was not on a special
diet.  Widman reported that, as a result of the radiation he had received, he was in "severe,
ongoing, chronic pain," and was unable to perform activities of normal living for more than
one to two hours at a time, after which he required rest for up to two hours.  Tr. 231.
Widman complained of chronic pain in the "back, pelvis region, in all of his joints,
including the knees, shoulders, elbows, wrists and hands."  Widman stated that he had
anorexia, though he was slightly obese at 5' 11" and 215 pounds.  Mr. Barfield noted "mild
tenderness in the paraspinous muscles throughout the lower back and the thoracic spine as
well.   More pronounced in the lower back region.  Has limited flexibility and limited
rotation, and ROM in the lower back."  Tr. 232.

On July 31, 1996, Widman was examined by David Allen, M.D., Ph.D., at the
request of vocational rehabilitation services.  Tr. 234-38.  Dr. Allen stated, "The patient is
very angry.  He also claims he does not feel well.  He was only partially cooperative.  He
did refuse parts of the physical examination pertinent to his complaints of musculoskeletal
pain."  Tr. 234.  Dr. Allen reported:

> The patient complains of numerous musculoskeletal aches
> and pains.  These are from the waist down.  He states he
> has had increasing troubles ever since he had chemotherapy
> and radiation but they are much worse over the last 3 years.
> He has pain in both buttocks radiating around to the groin.
> This is worse with walking, but it is continuously present.
> He has lightening like pains going down his legs, the right
> leg more than the left....He states he has decreased sensation
> to touch over the anterior thighs.  He claims he has numbness
> on his buttocks, but denies any decubitus ulcers.
>
> He claims that his "cheeks" bleed when he walks, referring to
> the intergluteal crease.

6 - FINDINGS AND RECOMMENDATION

> He claims his feet for 3 years have felt as though they are going
> to sleep. This does not vary with time of day, posture, activity
> or footwear.
>
> I was unable to obtain a reasonable motor strength history from
> him.

Tr. 235. Widman asserted that he was incontinent, but denied any problems with his neck, fingers, wrists, elbows or shoulders. *Id.* Dr. Allen stated that "[e]xam showed a very hostile, angry, 40 year old white male who was well developed, well nourished and in no distress." Tr. 236. Upper extremities were well muscled with no atrophy, 2+ biceps and triceps reflexes, and 5+ grip, pinch, hook, biceps, and triceps. Shoulder motion was abnormal on rotation only. Straight leg sitting was normal. "Patient would not permit straight leg raising lying beyond 50 degrees on the left and 30 degrees on the right, complaining of pain in the back." Tr. 237.

> Patient did not permit a full knee or hip examination.
> He had estimated 15 degrees of external rotation of
> the right hip but no internal rotation. The left hip had
> normal feeling internal rotation but again these were
> not measured.
>
> The patient did not provide much resistance to extensor
> hallucis longus, quadriceps or hamstring testing, and I
> think the results are bogus. He flatly refused to try to
> stand on his heels, toes or to squat.
>
> . . .
> I asked the patient about some scratches on his left posterior
> calf. He bent over to the left and arched backwards to look
> at his calf, far further than he ever did when I was trying to
> measure back motions.

Tr. 237-38. Dr. Allen stated that he did not attempt a psychological evaluation of "this extremely hostile patient. He seemed quite inappropriate and professed to be totally uninformed about current health problems, and yet had very fixed opinions about old ones." Tr. 238.

In August 1996, the Social Security Administration notified Widman that his health

7 - FINDINGS AND RECOMMENDATION

1    had improved to the point that he was no longer disabled.  Tr. 64.

2        There is no record of medical care for the next 17 months, until December 1997,

3    when Widman was seen in Dr. Burns's office.  Tr. 258.  His weight had increased to 273

4    pounds, and his "main problem is hip pain."  Widman complained that he could barely

5    walk a block, and he had some pain in the left hip, but the pain was significantly worse in

6    the right hip.  His left hip could be flexed to 90 degrees, but there was "very little" internal

7    or external rotation.  The right hip could be flexed to 50 degrees with no internal or

8    external rotation.  He was not on any medication, and was prescribed Naprosyn, a non-

9    steroidal anti-inflammatory.  Hip x-rays were normal, with smooth femoral heads, normal

10    SI joins and symphysis pubis, and the femoral-acetablular joint spaces well maintained.  Tr.

11    247, 258.  Widman reported in January 1998 that the Naprosyn did not help, and that he

12    would prefer not to take any other medications at that time.  Tr. 258.

13        In August 1998 Dr. Burns responded to a request from the State of Oregon

14    Disability Determination Services, "I have not done even a minimal examination of this

15    patient for several years and would not be able to answer any of your questions regarding

16    his ability to handle certain types of work."  Tr. 265.  In September 1998 Widman refused

17    to appear for an examination by a disability services physician.  Tr. 102.

18        The next medical record is dated July 1999, when Widman was examined by Eric

19    Sandefur, D.O., in an initial orthopedic evaluation for chronic low back pain, bilateral leg

20    pain and weakness, left wrist pain, and right shoulder pain.  Tr. 288.  On examination, Dr.

21    Sandefur found some generalized tenderness to palpation of the lumbar spine, more

22    pronounced on the right.  Widman could forward flex to about 30 degrees with increasing

23    back pain and posterior buttock pain.  Extension was to neutral.  He had difficulty with heel

24    and toe walk, stating that this aggravated low back pain.  Deep tendon reflexes while seated

25    were 2+/4 at both patella and Achilles bilaterally.  Motor strength in both lower extremities

26    was 5/5, somewhat limited by pain.  Tr. 289.

Widmer had a full range of motion in both hips "without restrictions," and external rotation caused pain to the posterior buttock and lumbar spine. *Id.* His left wrist had a full range of motion with some mild pain with maximal ulnar deviation and dorsiflexion. Grip strength was 5/5. Examination of the shoulder revealed no muscular atrophy, but tenderness to palpation over the anterior and lateral aspects of the acromion, and a "fairly good range of motion." *Id.*

Lumbar spine x-rays revealed evidence of "multilevel degenerative changes of the lumbar spine with anterior osteophytic spurring, joint space narrowing, and marked facet arthrosis of the entire lumbar spine. There is marked disk space narrowing at L5-S1 along with narrowing at L4-5, along with neural foraminal narrowing." Tr. 289.

Dr. Sandefur concluded :

> I suspect that he will always have chronic back pain. I believe that he needs to be restricted in the activities that he could do. He is definitely restricted to the light-job-type duties with no lifting, carrying, bending, pushing, or pulling. He would be better suited for a job where he could alternate sitting or standing for short periods of time, basically 15 to 30 minutes. In terms of the right shoulder, I believe that he has a simple rotator cuff tendonitis or bursitis which has been due to a recent aggravation from some overuse and this should probably resolve with time. ...He should continue with the Advil for [t]his, as well as for the left wrist, which appears to be simply an overuse also....with his multiple complaints, as well as the obvious documented changes on the lumbar spine x-rays, that he will be significantly restricted for any type of gainful employment and I believe that he would only be able to be gainfully employed on a part-time basis with very limited duties.

Tr. 290.

On October 11, 1999, Widmer returned to Dr. Sandefur because "his lawyer recommended that he come in to see me today to further document his symptoms, since he states that he is getting worse...." Tr. 301. Examination of the upper extremities and the lumbar spine were unchanged. Wrist extension and flexion and grip strength was slightly diminished at 4+/5. In addition, Widmer complained of paravertebral muscle fullness and

1  soreness of the neck, more pronounced on the right than the left.  Dr. Sandefur diagnosed

2  probable carpal tunnel syndrome, left greater than right, right rotator cuff tendinitis, and

3  chronic mechanical low back pain secondary to lumbosacral spondylosis.  *Id.*

4      On November 2, 1999, Dr. Sandefur filled out a form in which he opined that

5  Widmer's impairments were not reasonably consistent with his symptoms because he has a

6  low pain tolerance and dwells on his complaints.  Tr. 305.  Dr. Sandefur opined that

7  Widmer would need to work at a reduced work pace if employed full time, and that his

8  health problems would likely become worse if he worked full time.  Tr. 306.  Dr. Sandefur

9  asserted that Widmer could walk about two blocks without rest or severe pain, and could

10  sit or stand no more than one hour at one time.  Dr. Sandefur estimated that Widmer would

11  likely be absent from work about four times a month due to his impairments.  Tr. 309.

12      On April 12, 2000, Widman was examined by Mark Sternfeld, M.D., Ph.D., at the

13  request of vocational rehabilitation services.  Tr. 313-14.  Widman reported that his

14  symptoms had been present since his surgery in 1990, consisting primarily of low back

15  pain with radiation to the legs, right greater than left.  He denied bladder or bowel

16  dysfunction.  Widman weighed 278 pounds and had an antalgic limp:

17          He refuses to walk on his toes.  He refuses to walk on his
          heels.  He refuses to squat down.  He refuses to bend over
18          and try and touch his toes.  He has palpable tenderness
          throughout the lumbar and sacral spine.  He also has a positive
19          Waddell's sign bilaterally.  There is no appreciable tenderness
          over the sciatic notch or sacroiliac joint.  He has positive
20          straight leg raises bilaterally as soon as the foot is lifted from
          a 90 degree angle with pain referred to the back.  He has 2+
21          deep tendon reflexes that are symmetric.

22          Neurologic exam:  Cranial nerves II-XII are intact.  Motor
          strength I am not able to assess.  He has breakaway weakness
23          in all areas tested, including his hands, grip, wrists, elbows
          and shoulders.  He also has breakaway pain in the lower
24          extremities as well.  Sensory exam is normal.

    ///

25  ///

26

10 - FINDINGS AND RECOMMENDATION

> 1. Chronic low back pain, mechanical. There is no evidence of radiculopathy or spinal involvement.
>
> I am unable to assess the patient's ability or disability at this time secondary to noncompliance with the exam. It is clear that he has a significant psychological component to his illness and disability. I would recommend a full psychological evaluation to assess both his psychological status and motivation.

Tr. 314.

On June 29, 2000, the first ALJ in this matter issued a decision in which he found Widman not disabled. On July 12, 2000, Dr. Burns reviewed the ALJ's decision and wrote that he supported Dr. Sandefur's conclusions, in part because Dr. Sandefur is an orthopedic surgeon. Tr. 338-39.

On December 6, 2000, Widman commenced treatment with Daniel Smithson, M.D., reporting chronic low back pain, sometimes radiating down his left leg, and bilateral hip pain. Tr. 446-464. Dr. Smithson advised discontinuing Advil and trying Vioxx, 25 mg. On March 29, 2001, Dr. Smithson advised discontinuing the Vioxx and substituting Oxycontin, 20 mg. with Vicodan, 500 mg., for breakthrough pain, and Amitriptyline, 50 mg, daily to help with the chronic pain. Tr. 461.

On April 25, 2001, Widman reported that he was not using the Amitriptyline as prescribed. Dr. Smithson advised using the Amitriptyline as prescribed, and continuing the OxyContin at 20 mg twice a day with Vocodin for severe pain. In May 2001 Widman reported needing Vicodin 2-3 times a day for breakthrough pain. Tr. 459. He reported no radicular pain into his lower extremities and no incontinence.

In June 2001 Dr. Smithson again advised Widman to resume the Amitriptyline, and to increase the OxyContin from 20 mg. to 30 mg. Tr. 458. In August 2001 Widman reported discontinuing the OxyContin because of agitation, and continuing with Vicodin, one to two every four to five hours. *Id.* On August 29, 2001, Widman reported that his back pain had returned to baseline off of his narcotics, and he was unable to do his driving

1    job. Tr. 457. He resumed OxyContin at 30 mg with Vicodan for breakthrough pain.

2           On November 29, 2001, Widman increased his OxyCotin to 80 mg twice a day. Tr.

3    454. In addition, he was taking Flexeril 10 mg, and Dr. Smithson reported that this "has

4    worked quite well. Yesterday while he was outside splitting some wood and he raised the

5    axe over his head, he felt some popping in his lower back, and exacerbation of his chronic

6    pain." *Id.*

7           In January 2002 Widman reported that the back pain was "much better controlled"

8    on 60 mg of OxyContin, and that he required no Flexeril or Vicodan. *Id.* By late February

9    2002 the pain was worse, and his Oxycontin was increased to 75 mg twice a day. He was

10   advised to resume Amitriptyline at 50 mg. Tr. 453. Between May 31, 2002, and

11   December 2002 Widman was prescribed 120 OxyContin, 40 mg., per month, and 60 M-

12   oxy, 5 mg., per month.

13          On June 27, 2002, Dr. Smithson noted that Widman complained of right shoulder

14   pain, "which has been present off and on for months to even years, but worse over the last

15   5 days since he's been rearranging a woodpile outside of his house." Tr. 451. On July 30,

16   2002, Dr. Smithson noted that Widman "has a business opportunity cutting firewood. He's

17   been doing this almost every day for the last couple of weeks and this has

18   clearly exacerbated his pain." Tr. 450. Dr. Smithson suggested physical therapy or an

19   injection for the shoulder, which Widman refused.

20          By August 27, 2002, Dr. Smithson reported that the right shoulder was "markedly

21   improved. This is most likely owing to the fact that he's no longer cutting firewood

22   because the forest is closed due to fire danger." *Id.* Again, Widman refused recommended

23   physical therapy.

24          In October and November 2002, Widman reported that his back pain was well

25   controlled on the OxyContin. "Symptoms are worse when he's cutting wood." Tr. 449.

26          On April 1, 2003, Dr. Smithson wrote that Widman's pain was "moderately well

12 - FINDINGS AND RECOMMENDATION

1    controlled" on 80 mg of OxyContin and M-Oxy, 5 mg., two to three times a day. Tr. 447.

2    Dr. Smithson noted that he recommended further evaluation at the Boise Pain Clinic, but

3    Widman refused. "I have mentioned that the discrepancy between his symptoms that he

4    has when he comes to see me and the fact that he spent most of the winter cutting wood. I

5    have no doubt that he's in pain. Unfortunately, I'm unable to know exactly how much or

6    how severe other than from his history." *Id.*

7        On September 2, 2003, Dr. Smithson completed a form prepared by Widman's

8    counsel, in which he opined that Widman suffered from lumbar disc disease, exacerbated

9    with activity and lifting, and referred to x-rays of 3/20/00 which "shows degenerative disc

10    L5-S1 and wedging of T-12." Tr. 389. This is the only reference in the entire medical

11    record, including Dr. Smithson's records, to x-rays taken in March 2000. Dr. Smithson

12    asserted that Widman's condition could be expected to last at least twelve months, that his

13    condition was degenerative, and that he would need to work at a reduced pace if working

14    full time at the light or sedentary level of exertion. Dr. Smithson stated that Widman was

15    not a malingerer, and declined to identify any psychological conditions as affecting

16    Widman's physical condition. Tr. 390. Dr. Smithson opined that Widman would need the

17    opportunity to shift at will from sitting to standing or walking, and that his impairments

18    would cause Widman to be absent from work about twice a month. Dr. Smithson

19    concluded that Widman had been "unable to work at least since I've know him (Dec.

20    2000)." Tr. 394.

21        Between April 2003 and February 2004, when this portion of the medical record

22    ends, it appears that Widman was prescribed 180 OxyContin, 40 mg., per month, and 120

23    M-Oxy, 5 mg., per month.

24    ///

25    ///

26    ///

## HEARING TESTIMONY

I. Widman's Testimony

At the September 1999 hearing, Widman testified that he had stopped working at a gas station about six weeks prior to the hearing. Tr. 34. He had held the job for about eight and one half months. He last worked full-time in 1990.

Widman testified that he was unable to work full time because of pain in his hips and spine, and that he had increasing numbness in his hands. Tr. 35. He stated that he was unable to hold anything "for any period of time," and that it "hurts to even try to hold the pen to even write my signature." *Id.* Widman had noticed that his hand had started shaking in the last five to six months.

Widman stated that the pain was continuous. He was unable to crouch without severe pain, and he was unable to perform many of the regular duties of the service station attendant. Tr. 36. His boss made allowances for his physical limitations. Widman testified that it takes "at least half an hour to try to even ...bend my knee to where I can get into a position to even tie my shoes," due to pain and stiffness. *Id.* He was not taking any medications for the pain because they made him sick.

Widman testified that the numbness and shaking in his hands was fairly constant. Tr. 38. He was unable to hold or grasp anything because of the pain. He was unable to hold a squeegee in his hand to wash windshields.

He was unable to sleep well because of pain. Widman stated that he had not slept more than four hours a night since 1990. Tr. 39. On an average night he slept one and a half to two hours. He lies down once or twice a day for about an hour, but he is always tired. Tr. 40. Getting dressed is painful, and putting on his shoes can take up to half an hour.

Widman stated that he gets tired if he walks half a block, that he can stand or sit between 15 and 30 minutes before changing position. Tr. 41. He does not cook, but

1    prepares sandwiches. His friend Janine cooks for him. Tr. 42. Janine also does the

2    vacuuming and household work. Tr. 45.

3        Widman testified that he was not absent from his gas station job, because "I

4    couldn't afford not, not to work...." Tr. 44. Since leaving the gas station job, the pain is

5    worse in his pelvic area, hips, and feet, and the numbness in his arms and hands has

6    increased. *Id.* He cannot climb or descend stairs because of pain. If he could lift a gallon

7    of milk, he would be unable to hold on to it because of the weakness and pain in his hands

8    and arms. Tr. 46.

9        He does not have good and bad days, they are "all about the same, bad." *Id.*

10   Reaching down, straight ahead, and above his shoulder level all cause shooting pain. He

11   cannot push or pull a vacuum cleaner without pain. Tr. 47. Widman testified that his

12   lowest pain level, on a scale of zero to ten, is five. Tr. 49. He has tried medication for

13   pain, but it upsets his stomach and causes him to vomit blood. *Id.* Aspirin makes him

14   nauseated.

15       At the November 2004 hearing Widman testified that he has a pickup truck, and

16   hauls wood to use in his home woodstove. He stated that he did not cut the wood, his

17   friend did most of the stacking of the wood, and his son split the wood for him. Tr. 541.

18       Widman stated that he tried to exercise, but that he does not feel well. His weight

19   was about 234. He has no appetite. Widman testified that the safe limit of radiation to the

20   lower gastrointestinal tract is 6,800 units, and that he had received 9,000 units. Widman

21   said that Dr. Sandefur had told him he had the back of a 90 year old man. Widman said

22   that he was "falling apart because of the extreme amount of radiation they have given me, I

23   suffer from post-radiation syndrome....I'm falling apart daily, and I'm never going to get

24   better. I just keep getting worse. What I've been through has been Hell...." Tr. 542-43.

25       Widman has rental properties, but he does none of the maintenance. One of his

26   properties is currently uninhabitable as the result of water damage.

15 - FINDINGS AND RECOMMENDATION

Widman stated that he has had anger management issues for a long time "because I just don't feel well." Tr. 547. He worked as a cashier for a short time. "[I]t started out pretty much full time, but then I got taken back because of my attitude." *Id*. He had trouble "[p]utting up with the public." *Id*. He was short-tempered, and left by mutual agreement.

Widman said he had "problems with depression." Tr. 548. He has "a lot" of crying spells, that last five to fifteen minutes. *Id*. He does not fix complete meals, and has not " had a complete meal since probably 10 years." Tr. 549. When he is crying he cannot do anything else. He is irritable for hours every day, and sometimes raises his voice with people and uses bad words. He has only a few friends. In the past six or seven months he has "a real hard time remembering things that I just did in the last few days. I'll have to go double sometimes triple-check to make sure if I have been using the stove, fixing a can of soup or something, make sure that I turn the light off, shut the stove off." Tr. 549-50.

Questioned about wood cutting, Widman testified that it lasted for "[M]aybe a week, and that was it." Tr. 551. His friend cut and loaded the wood, most of which was for Widman's use in his stove. His friend "sold a couple of loads" to third parties. *Id*. Widman kept some of the proceeds for his fuel costs and wear and tear of the tires. Tr. 552.

II. Lay Testimony

In the September 1999 hearing Janine Errend testified that she is Widman's friend. She has known him "at least six years," and sees him for about an hour, two or three times a week. Tr. 50. Errend testified that Widman limps, and might be able to walk a block without stopping to rest. *Id*. She thinks that he is in pain "all the time." Tr. 51. Errend testified that Widman could operate his riding lawn mower for about 15 minutes before resting for about half an hour. *Id*. She thought his pace was about half that of a normal person's pace.

16 - FINDINGS AND RECOMMENDATION

In the November 2004 hearing Errend testified that she has known Mr. Widman for about 40 years. Tr. 552. She has seen him about once a week in the prior three or four years. Errend testified that Widman has a problem with his grip, and that he drops cups. Tr. 553. He is "pretty irritable...[w]henever I'm around him." *Id.* The irritation lasts about 10 minutes, though it depends on what he is upset about. When he is irritable he raises his voice, uses bad words, and cries. The crying spells usually last five to 10 minutes. Tr. 554. As to memory, attention span and concentration, Errend stated that "He just gets to talking about one thing and just kind of switch[es] over to something else. Then he might come back to whatever he was talking about." *Id.*

Errend lives about seven miles from Widman. He comes to visit her and they "mainly just play cards." Tr. 555. Widman is a "pretty good" card player. Tr. 556. They play games requiring strategy, like Spite and Malice.

Once every couple of months, Widman gets depressed and has a crying spell at Errend's home. Tr. 559. Errend was not aware of Widman having a wood cutting business, cycling, or fishing.

III. Vocational Expert Testimony

Gary Jesky testified at the first hearing that a hypothetical person Widman's age, with Widman's education and work experience, limited to occasionally lifting 20 pounds, frequently lifting 10 pounds, and standing or walking about six hours a day, or sitting six hours a day, would be able to perform the work of a cashier or small product assembler. Tr. 52-53.

If the hypothetical individual were limited to only two hours of standing and walking in an eight hour day, the same result would occur. Tr. 54.

If the hypothetical individual required a rest break of up to one hour twice a day, there would be no competitive work available. *Id.*

All of the identified jobs require "significant amounts of handling," and if a person

1    had poor grip strength it would be a "negative factor." Tr. 55.

2         If the first hypothetical individual could walk, with a limp, one block only, on a

3    level surface, appeared to be in pain, was fatigued, and worked at one half the pace of a

4    normal person, there "would be a significant chance of difficulty in maintaining

5    competitive employment." Tr. 56.

6                               STANDARD OF REVIEW

7         The district court must affirm the Commissioner's decision if it is based on proper

8    legal standards and the findings are supported by substantial evidence in the record as a

9    whole.  42 U.S.C. § 405(g); *see also* <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir.

10   1995).  "Substantial evidence means more than a mere scintilla but less than a

11   preponderance; it is such relevant evidence as a reasonable mind might accept as adequate

12   to support a conclusion." <u>Andrews,</u> 53 F.3d at 1039.  The court must weigh all of

13   the evidence, whether it supports or detracts from the Commissioner's decision.  <u>Martinez</u>

14   <u>v. Heckler,</u> 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be

15   upheld, however, if "the evidence is susceptible to more than one rational interpretation."

16   <u>Andrews,</u> 53 F.3d at 1039-40.

17        The ALJ is responsible for determining credibility, resolving conflicts in the

18   medical evidence and resolving ambiguities.  <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1156

19   (9th Cir. 2001).  If the evidence can reasonably support either affirming or reversing the

20   Commissioner's conclusion, the court may not substitute its judgment for that of the

21   Commissioner.  <u>Batson v. Commissioner of Soc. Sec. Admin.,</u> 359, F.3d 1190, 1193 (9th

22   Cir. 2004).

23                                 **DISCUSSION**

24        Widman contends that the ALJ erred by improperly 1) failing to comply with the

25   District Court's Order to obtain a psychological examination; 2) rejecting the opinion of

26   David R. Starr, Ph.D.; 3) rejecting the opinion of  Eric Sandefur, D.O.; 4) rejecting the

18  - FINDINGS AND RECOMMENDATION

opinion of Daniel Smithson, M.D.; 5) evaluating Widman's residual functional capacity; 6) relying upon a defective hypothetical; 7) relying on the Vocational Expert's testimony as to the number of available jobs; 8) rejecting lay witness testimony; and 9) finding Widman not fully credible.

I. Psychological Examination

On June 8, 2003, this court ordered this case remanded for further administrative proceedings:

> [t]he administrative law judge (ALJ) will obtain additional evidence to determine whether Plaintiff has a mental impairment, including a mental status examination with psychological testing and medical source statements regarding any limitations Plaintiff may have in work or work-like settings. The ALJ will then re-evaluate Plaintiff's symptoms and credibility as well as his residual functional capacity....

Tr. 379.

Widman argues that he did not receive a complete psychological assessment. In the November 2004 hearing, he testified as follows:

> Q You had a psychological appointment earlier this summer that the Judge talked about a little bit ago. How much time did you spend with Dr. Starter [phonetic] before he handed you a psychological test?
>
> A He [INAUDIBLE]
> Q How long did the test take?
>
> A A little over an hour-and-a-half.
>
> Q After the test was over, what did you do?
>
> A Well, when he brought me out there, showed me where the desk was, he said well, when you're done, just put it back over here and then you can leave. I never spoke to him again. I never saw him again. He was with another appointment.

Tr. 550. Widman now contends that he was never examined and that therefore the psychological assessment was incomplete. Widman argues that the psychological

1    assessment failed adequately to address whether his pain complaints may be attributable to

2    a mental impairment such as a pain disorder or chronic pain syndrome.

3        The record indicates that David R. Starr, Ph.D., conducted a Psychological

4    Evaluation of Widman on July 12, 2004.  Tr. 468-72.  Dr. Starr noted that Disability

5    Determination Services ("DDS") requested the evaluation and specifically requested

6    information regarding depression and "the extent to which that might contribute to his

7    overall ability to work."  Tr. 468.  Dr. Starr noted that he obtained information from

8    Widman and from a review of records supplied by DDS.  Dr. Starr's report includes

9    multiple quotes of Widman's responses to questions about his family, his personal

10   relationships, his health, and his activities of daily living.  Tr. 468-70.  Dr. Starr stated:

11               John Widman's response to the MMPI-2 did not produce
             a valid profile.  He over endorsed pathology in a likely
12           attempt to appear more disturbed than he really is.  The
             clinical scales were not interpretable.  The following
13           conclusions and recommendations are derived from data
             set forth above and are limited accordingly.
14
             Psychological testing was only suggestive of an attempt
15           to appear more impaired that [sic] Mr. Widman really is.
             Consequently, his response is not helpful in determining
16           the extent and severity of his depression.  It may be that
             he is over stating his problems for secondary gain.
17
             Mental status exam yielded mixed results....His fund of
18           information was estimated to be below average and he
             did not likely do his best in discussion of the abstract
19           meaning of proverbs.

20   Tr. 471-72.  Dr. Starr diagnosed depressive disorder NOS, and assessed a Global

21   Assessment of Functioning (GAF)[3] score of 55.

22

23        [3]The GAF scale is a tool for "reporting the clinician's judgment of the individual's  overall
     level of functioning."  American Psychiatric Ass'n., Diagnostic and Statistical Manual of
24   Mental Disorders 32 (4th ed. 2000).  It is essentially a scale of zero to 100 in which the
     clinician considers "psychological, social, and occupational functioning on a hypothetical
25   continuum of mental health-illness," not including impairments in functioning due to
     physical or environmental limitations.  Id at 32.  A GAF score between 51 and 60 indicates
26   "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or
     moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts

1    In his Reply, Widman concedes that an examination did occur.  He continues to

2    argue that the psychological assessment inadequately addressed whether his pain

3    complaints are attributable to a mental impairment.  However, it is clear that Dr. Starr

4    conducted a complete psychological examination including testing.  Dr. Starr diagnosed

5    depressive disorder NOS, noting that Widman's responses were "not helpful," and that the

6    testing was not valid.  *Id.*  Dr. Starr asserted that his conclusions were limited accordingly.

7    Dr. Starr did not find a connection between Widman's mental impairment of depression

8    and his pain complaints. Widman cannot complain that his psychological assessment was

9    inadequate when he did not participate either fully or honestly.

10   II.  Dr. Starr's Opinion

11   Widman contends that the ALJ erred by rejecting Dr. Starr's opinion that he has

12   "moderate to severe symptoms of impairment in social functioning...." Tr. 471.   The ALJ

13   stated:

> Dr. Starr opined the claimant had moderate limitations in
> his ability to interact appropriately with the public, super-
> visor and co-workers.  However, these findings are accorded
> little weight as they are based solely on the claimant's ex-
> aggerated presentation and subjective complaints.  Dr. Starr
> reported psychological testing was suggestive of the claimant's
> attempt to appear more impaired than what he actually was
> and that such was done for secondary gain.  The Administra-
> tive Law Judge finds this behavior to be most consistent with
> the claimant's presentation as noted throughout the entire
> record and as noted by the prior Administrative Law Judge.
> It is also noted the claimant failed to provide any new infor-
> mation or medical records to substantiate any mental impair-
> ment.

Tr. 370.

An ALJ may reject an examining physician's opinion that is inconsistent with the

opinions of other treating or examining physicians, if the ALJ makes "findings setting forth

specific, legitimate reasons for doing so that are based on substantial evidence in the

with peers or co-workers).  *Id* at 34.

1    record." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) quoting Magallanes v.

2    Bowen, 881 F.2d 747, 751 (9th Cir. 1989); Lester v. Chater, 81 F.3d 821, 830 (9th Cir.

3    1996). An uncontradicted opinion may be rejected for clear and convincing reasons.

4    Thomas, 278 F.3d at 956-57.

5         Dr. Starr's opinion that Widman has moderate to severe limitations in social

6    functioning is not contradicted. However, the ALJ's rejection of that opinion is supported

7    by clear and convincing reasons. The ALJ noted that Dr. Starr's opinion was based solely

8    on Widman's presentation, as Widman's behavior invalidated most of the psychological

9    tests administered. Dr. Starr himself said that his "test interpretations presented below are

10   only hypotheses and should not be used by the reader of this report in isolation from other

11   information in this matter." Tr. 471. The ALJ also correctly noted that there are multiple

12   occasions where Widman's physicians report behavior including lack of cooperation,

13   hostility, and the attempt to appear more limited than he is. Dr. Allen reported that

14   Widman was "very angry," and "only partially cooperative. He did refuse parts of the

15   physical examination pertinent to his complaints of musculoskeletal pain." Tr. 234-38.

16   Some of the test results "are bogus. He flatly refused to try to stand on his heels, toes or to

17   squat...I asked the patient about some scratches on his left posterior calf. He bent over to

18   the left and arched backwards to look at his calf, far further than he ever did when I was

19   trying to measure back motions." Id.

20        Widman refused to schedule a consultative examination, reportedly stating that "I'm

21   not going to any of their quack doctors." Tr. 102. Dr. Sternfeld reported that Widman

22   refused to cooperate with his physical examination. Tr. 313-14.

23        The ALJ had clear and convincing reasons supported by substantial evidence in the

24   record to reject Dr. Starr's opinion that Widman had moderate to severe limitations in

25   social functioning.

26   ///

22 - FINDINGS AND RECOMMENDATION

1    III. <u>Dr. Sandefur's Opinion</u>

2          Eric Sandefur, D.O., an orthopedist, examined Widman in July 1999. Tr. 288-90.

3    X-rays revealed "multilevel degenerative changes of the lumbar spine with anterior

4    osteophytic spurring, joint space narrowing, and marked facet arthrosis of the entire lumbar

5    spine. There is marked disk space narrowing at L5-S1 along with narrowing at L4-5, along

6    with neural forminal narrowing." Tr. 289. Dr. Sandefur found Widman "is definitely

7    restricted to the light-job-type duties with no lifting, carrying, bending, pushing, or pulling.

8    He would be better suited for a job where he could alternate sitting or standing for short

9    periods of time, basically 15 to 30 minutes." Tr. 290. Dr. Sandefur opined that Widman

10   was "significantly restricted for any type of gainful employment," and that he could tolerate

11   part-time employment with "very limited duties." *Id*. Dr. Sandefur stated that Widman's

12   pain was frequently to constantly severe enough to interfere with his attention and

13   concentration. Tr. 305. Widman would be expected to work at a reduced pace if employed

14   full-time, and his health would be adversely impacted. Tr. 306. Dr. Sandefur stated that

15   Widman could stand or walk about two hours in an eight hour day, and sit about four

16   hours. He required the ability to shift position at will, and take two to three unscheduled

17   breaks during the day. Tr. 307. Dr. Sandefur expected that Widman would miss work

18   about four times a month due to his impairments. Tr. 309.

19          The ALJ noted the x-rays relied upon by Dr. Sandefur, and stated:

20                  I would reject the limitations and the statements of Dr. Sandefur
                    as being conclusionary and without support. The assessment of
21                  any disability or not is one reserved to the Commissioner of
                    Social Security. Furthermore, the claimant was then working
22                  as a gas station attendant and by that activity was demonstrating
                    abilities far greater than indicated by Dr. Sandefur. Dr. Sandefur's
23                  opinion is also at odds with the reports of two qualified consulta-
                    tive orthopedists who examined the claimant.
24

25   / / /

26

23  - FINDINGS AND RECOMMENDATION

1
2
3
4
5

> The claimant returned to Dr. Sandefur...[who] found evidence of
> probable carpal tunnel syndrome, but indicated there were no
> changes in ...work restrictions.  He did not mention any hand
> restrictions related to the carpal tunnel syndrome.  He later com-
> pleted a Residual Functional Capacity Questionnaire on Novem-
> ber 2, 1999, setting forth restrictions on repetitive reaching,
> handling and fingering, as well as a less than sedentary restriction
> [citation omitted].  I can give these reports no more weight than
> his initial opinion for essentially the same reasons.

6    Tr. 367-68.

7          However, Dr. Sandefur's opinion with respect to many of Widman's limitations is

8    apparently based on Widman's subjective complaints.  As the ALJ noted, at the time of the

9    July 1999 examination Widman was working in a gas station and demonstrating less

10   limitation than Dr. Sandefur found.  In addition, Dr. Sandefur himself completed a form in

11   November 1999, in which he stated that Widman's impairments are not reasonably

12   consistent with the symptoms and functional limitations described because he "believes

13   patient has a low pain tolerance and dwells on his currant complaints."  Tr. 305.  Dr.

14   Sandefur's opinion is specifically endorsed by Dr. Burns, Widman's treating physician.  Tr.

15   338-339.

16         As to his work as a gas station attendant, Darren Warren attests, in a notarized letter

17   dated September 29, 1999, that he employed Widman as a service station attendant for

18   about a year.  Tr. 300.  Warren states that Widman was slow and that he had trouble

19   holding onto tools.  Warren states that he eventually terminated Widman for "failure to be

20   able to perform job duties."  *Id.*  However, Warren's statement is based upon Widman's

21   incredible assertions.

22         Dennis Dora asserts, in an unsworn form prepared by Widman's counsel, that he

23   employed Widman from November 3, 1999, to February 28, 2000, as a cashier.  Tr. 310-

24   12.  Dora states that Widman stood or walked two to four hours a day, and was terminated

25   or quit because of difficulties related to his illness or injury.  Tr. 311.  Dora checked boxes

26   indicating that Widman's work performance was adversely affected by pain and

24 - FINDINGS AND RECOMMENDATION

1   fatigue/stamina.  Dora's statement also relies upon Widman's credibility.

2          The ALJ stated that Sandefur's opinion was "at odds with two qualified consultative

3   orthopedists who examined the claimant." Tr. 367.  While these doctors were internists,

4   not orthopedists, they do reach conclusions contrary to Sandefur.  The first physician, Dr.

5   Allen, examined Widman in July 1996. Dr. Allen reported that his testing results were

6   "bogus," in that Widman failed to cooperate, as set out in detail above at pages 6-7.  Dr.

7   Allen implies that Widman attempted to deceive him as to his limitations when Widman

8   "bent over to the left and arched backwards to look at his calf, far further than he ever did

9   when I was trying to measure back motions." Tr. 238.  The second examining physician,

10  Dr. Sternfeld, examined Widman in April 2000.  Tr. 313-14.  Dr. Sternfeld concluded that

11  he was "unable to assess the patient's ability or disability at this time" due to Widman's

12  noncompliance. Dr. Sandefur's opinion was neither confirmed nor contradicted by the

13  consulting physicians because of Widman's failure to cooperate.  That failure to cooperate

14  cannot accrue to Widman's benefit.

15         In addition, Dr. Sandefur's July 1999 opinion does not address Widman's condition

16  as of November 1, 1996, his alleged onset date of disability.

17         The ALJ identified clear and convincing reasons to reject Dr. Sandefur's opinions

18  as to Widman's limitations.

19  IV.  Dr. Smithson's Opinion

20         Jesse Smithson, M.D., treated Widman as set out at pages 11-13.  Dr. Smithson

21  opined, on a form prepared by counsel, that Widman had been unable to work "at least

22  since I've known him (Dec. 2000)." Tr. 394.

23         The ALJ rejected Dr. Smithson's opinion, stating:

24         However, his medical records (Exhibit 76) fail to substantiate his
           assessments.  While Dr. Smithson opines disability, his records
25         noted the claimant was going on fishing trips, had gone on a two
           mile bike ride, engaged in wood cutting and hauling secondary
26         to his woodcutting business and has consistently had positive

Waddell's testing indicating symptom magnification. These activities seem to be in direct contradiction to an assessment of total and complete disability. Furthermore, the claimant had rental properties for which he provided maintenance (Exhibit 89). His records simply reiterate the claimant's subjective complaints and his conclusion the claimant was disabled. He fails to provide any diagnostic studies to support his opinion the claimant's degenerative disc disease is disabling. Furthermore, Dr. Smithson fails to conduct any actually [sic] psychical [sic] capacities evaluation to ascertain the claimant's actual limitations.

Tr. 370-71.

The ALJ's rejection of Dr. Smithson's conclusion is supported by a clear and convincing reason, i.e., Dr. Smithson's opinion is based entirely upon Widman's complaints. Dr. Smithson himself noted in April 2003:

I recommend further evaluation at the Boise Pain Clinic, but he refuses....I have advised to continue to go to PT with the goal to increase his function. I have mentioned that the discrepancy between his symptoms that he has when he comes to see me and the fact that he spent most of the winter cutting wood. I have no doubt that he's in pain. Unfortunately, I'm unable to know exactly how much or how severe other than from his history.

Tr. 447. As set out below, the ALJ properly discredited Widman's testimony, supplying another good reason to reject Dr. Smithson's opinion. The ALJ did not err in rejecting Dr. Smithson's opinion.

V. Residual Functional Capacity Analysis

Widman argues that the ALJ erred by failing to assess whether he is capable of working on a regular and continuing basis "even though he suffers from debilitating pain with depression." Plaintiff's Opening Brief, p. 15. As set out below, Widman's pain complaints are based primarily upon his own, not credible reports. As to depression, the record documents hostility and noncompliance, but Widman has not complained of , been diagnosed with, or treated for depression.

Widman argues that the ALJ's RFC assessment is deficient because the ALJ failed to consider plaintiff's unspecified non-severe mental impairments "despite the

26 - FINDINGS AND RECOMMENDATION

1    overwhelming opinions of examining and treating physicians." Plaintiff's Opening Brief,

2    p. 16. Counsel does not cite any of these supposedly "overwhelming" opinions. The

3    court's examination of the record reveals that there has been no credible diagnosis of a non-

4    severe mental impairment, at least in part because Widman refuses to cooperate with

5    physicians, including psychological evaluations. Tr. 468-72.

6         The ALJ's RFC determination is supported by substantial evidence.

7    VI. Hypothetical Question to the VE

8         Widman argues that fundamental fairness requires a foundation for VE testimony,

9    citing Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002). This issue has been addressed by

10   the Ninth Circuit. Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005). The court must

11   presume that plaintiff's counsel has read the Bayliss decision, as he represented the plaintiff

12   in that action. The Bayliss court specifically found that a "VE's recognized expertise

13   provides the necessary foundation for his or her testimony. Thus, no additional foundation

14   is required." Id.

15        Widman argues that Bayliss is not determinative "because the Court [sic] did not

16   examine the rationale for relaxing evidentiary rules in Social Security cases." Plaintiff's

17   Opening Brief, p. 20. Widman argues that VE testimony is inadmissible, citing Daubert v.

18   Merrel Dow Pharmaceuticals, Inc., 509 US 579 (1993). The Ninth Circuit specifically

19   rejected this argument in Bayliss, 427 F.3d at 1218, fn 4("The requirements established in

20   Federal Rule of Evidence 702, *Daubert,* and *Kumho* do not govern the admissibility of

21   evidence before the ALJ in the administrative proceeding in this Social Security case.")

22   Regardless of plaintiff's counsel's view of what the Ninth Circuit is alleged to have failed

23   to examine, Bayliss is determinative. The VE's expertise provides the necessary

24   foundation for his or her testimony.

25   VII. Evaluation of Lay Witness Testimony

26        Widman argues that the ALJ erred in rejecting the testimony of Janine Errend.

However, Widman does not point to any specific testimony that he believes was erroneously rejected.  Errend's testimony is summarized on pages 16-17 above.

The ALJ stated he had:

> further considered the testimony of the claimant's friend and finds such to be generally credible in as much as she is reporting her observations of the behavior the claimant demonstrates.  She is not knowledgeable in the medical and/or vocational fields and thus is unable to render opinions on how the claimant's physical impairments impact his overall abilities to perform basic work activities at various exertional levels.  Further, the limitations she testified to are not support [sic] by the medical records, especially those at Exhibit 76 [Dr. Smithson's records].

An ALJ must give germane reasons to reject lay witness testimony.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

The Commissioner argues that  Errend's testimony conflicts with the evidence of wood cutting recorded by Dr. Smithson.  This is true.

The ALJ's rejection of Dr. Sandefur's opinion was supported by clear and convincing reasons, as set out at pages 23-25.   Accordingly, the ALJ has not offered an adequate reason to reject the limitations observed by Errend.

VIII.  Evaluation of Widman's Credibility

Widman contends that the ALJ erred in finding him not fully credible.  The ALJ stated:

> At his current hearing he testified to debilitating pain, crying spells, anger problems and memory problems.  However, the objective medical records simply do not support his allegations. He has failed to provide any new information, other than that of Dr. Smithson, to substantiate his alleged anger, crying spells and memory problems.  Psychological testing revealed the claimant over reported symptoms in an attempt to portray himself as being more impaired that [sic] was actually the case in an attempt at secondary gain.  The records from Dr. Smithson fail to reveal any objective evidence to support the claimant's allegations of debilitating pain.  Furthermore, while the claimant alleges his pain prevents him from working, the records noted it does not prevent him form going fishing, running a wood cutting business wherein he spent the winter cutting wood and did not prevent

28 - FINDINGS AND RECOMMENDATION

1

2

3

> him from taking a two mile bike ride. It is also noted the only
> analgesic taken by claimant was over the counter Advil. The
> claimant attempted to minimize this activity or to simply deny
> it (Exhibit 76 pages 6, 8 and 9). Furthermore, he owns rental
> properties he maintains.

4    Tr. 372.

5    In addition, the ALJ noted and adopted the findings of the first ALJ, which

6    included that the claimant admitted to some work after the alleged onset date of disability,

7    but "not nearly as much as is shown in Social Security earnings information." Tr. 365.

8    The first ALJ found that Widman's pain complaints are allegedly long standing and related

9    to his radiation therapy, and yet he did not complain to Dr. Burns or seek treatment until

10   after his benefits ceased. Tr. 368.

11   Both ALJ's properly noted that Widman repeatedly refused to cooperate with both

12   physical and mental examinations, including those by Drs. Allen, Sternfeld, and Starr. Tr.

13   234-38; 313-14; 468-72. Widman took only Advil for his pain until December 2000, at

14   which time Dr. Smithson started him on Vioxx, 25 mg. Tr. 463.

15   Moreover, Widman testified in September 1999 that he had tried pain medication,

16   but it upset his stomach and caused him to vomit blood. There is no evidence in the record

17   that he reported this problem to any physician, and the assertion is inconsistent with the

18   massive amounts of pain medication that he was apparently tolerating by November 2001.

19   Tr. 454. In addition, Widman repeatedly refused physical therapy, a referral to a pain

20   clinic, or to take Amitriptyline as prescribed. Tr. 458; 453; 450; 447. Other clear

21   inconsistencies calling into question his credibility include that he has claimed to have no

22   appetite, but remains overweight. Widman claims to be "falling apart" from the amount of

23   radiation he received, but there is no medical record that he has complained of this, nor any

24   documents to support the assertion. Widman testified that he has not had a complete meal

25   in ten years, but his friend cooks for him. Finally, Widman is inconsistent as to the extent

26   of his activity cutting wood.

29 - FINDINGS AND RECOMMENDATION

1    The ALJ's credibility determination in based upon clear and convincing reasons and

2    supported by substantial evidence.

3                                RECOMMENDATION

4    The ALJ's finding that Widman is not disabled is supported by substantial

5    evidence.  The Commissioner's final decision should be affirmed and the case should be

6    dismissed.

7                                SCHEDULING ORDER

8    The above Findings and Recommendation will be referred to a United States

9    District Judge for review.  Objections, if any, are due February 26, 2007.  If no objections

10   are filed, review of the Findings and Recommendation will go under advisement on that

11   date.  If objections are filed, a response to the objections is due March 12, 2007, and the

12   review of the Findings and Recommendation will go under advisement on that date.

13   Dated this 9th day of February, 2007.

14

15

16   Dennis James Hubel
     UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

30  - FINDINGS AND RECOMMENDATION